IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

OCT 3 1 2002

CLERK, U.S. DISTRICT COURT
By _____
                    Deputy

| | |
|---|---|
| GEORGE ANDERSON HOPPER, | ) |
| | ) |
| Petitioner, | ) |
| | ) |
| VS. | ) |
| | ) |
| JANIE COCKRELL, Director, Texas | ) |
| Department of Criminal Justice, | ) |
| Institutional Division, | ) |
| | ) |
| Respondent. | ) |

CIVIL ACTION NO.

3:00-CV-0601-G

## MEMORANDUM ORDER

Petitioner George Anderson Hopper has filed an application for a writ of *habeas corpus* pursuant to 28 U.S.C. § 2254.  For the reasons stated herein, the application is denied.

### I.  PROCEDURAL BACKGROUND

Petitioner was convicted of capital murder and sentenced to death.  His conviction and sentence were affirmed on direct appeal.  *Hopper v. State*, No. 71,477



(Tex. Crim. App., Nov. 5, 1997).[1]  Petitioner also filed an application for a writ of *habeas corpus* in state court.  The Texas Court of Criminal Appeals denied *habeas* relief in an unpublished order.  *Ex parte Hopper,* No. 23,163-02 (Tex. Crim. App., Mar. 1, 2000).  Petitioner then filed this action in federal court.

## II.  ISSUES PRESENTED

Petitioner raises three broad issues in seven grounds for relief.  Succinctly stated, petitioner contends that:  (1) he was denied his constitutional right to counsel during a custodial interview, thereby rendering his subsequent statements inadmissible; (2) he was denied the effective assistance of counsel during his interrogation; and (3) his due process and confrontation clause rights were violated because the state failed to disclose that the lead investigator had entered into an agreement to assist in writing a book about the crime.  Furthermore, petitioner seeks an evidentiary hearing on all of these claims.

## III.  STANDARD OF REVIEW

The standard of review in federal *habeas* proceedings is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, which provides:

> (d)     An application for a writ of habeas corpus on behalf
>         of a person in custody pursuant to the judgment of a

---

[1]     Petitioner did not file a petition for writ of *certiorari* in the United States Supreme Court.

State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim --

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  This statute applies to all federal *habeas corpus* petitions which, as with the instant case, were filed after April 24, 1996, provided that they were adjudicated on the merits in state court.  *Lindh v. Murphy*, 521 U.S. 320, 326, 117 S.Ct. 2059, 2063, 138 L.Ed.2d 481 (1997).  Resolution on the merits in the *habeas corpus* context is a term of art that refers to the state court's disposition of the case on substantive rather than procedural grounds.  *Green v. Johnson*, 116 F.3d 1115, 1121 (5th Cir. 1997).

Section 2254(d)(1) concerns pure questions of law as well as mixed questions of law and fact.  *Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, __ U.S. __, 122 S.Ct. 194 (2001).  Under the "contrary to" clause, a federal *habeas* court may grant the writ of *habeas corpus* if the state court arrives at a conclusion opposite to that reached by the United States Supreme Court on a question of law or if the state

court decides a case differently from the United States Supreme Court on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 1523, 146 L.Ed.2d 389 (2000). With respect to the "unreasonable application" clause, a federal court may grant a writ of *habeas corpus* if the state court identifies the correct governing legal principle from the United States Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case. *Id.*, 529 U.S. at 413, 120 S.Ct. at 1523. Under *Williams*, a state court unreasonably applies Supreme Court precedent if it "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Williams*, 529 U.S. at 407, 120 S.Ct. at 1520.

Section 2254(d)(2) concerns questions of fact. *Moore v. Johnson*, 225 F.3d 495, 501 (5th Cir. 2000), *cert. denied*, 532 U.S. 949, 121 S.Ct. 1420 (2001). Under § 2254(d)(2), federal courts must give deference to state court findings unless they were "based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Chambers v. Johnson*, 218 F.3d 360, 363 (5th Cir.) (as modified on denial of rehearing), *cert. denied*, 531 U.S. 1002, 121 S.Ct. 508 (2000). The resolution of factual issues by the state court is presumptively correct and will not be disturbed unless the prisoner rebuts the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

- 4 -

IV.  <u>CONFESSIONS</u>
(Ground Nos. 1, 2 & 3)

In his third ground for relief, petitioner asserts that his Fifth Amendment rights were violated because the lead investigator ignored his request for counsel during a custodial interrogation conducted on December 20, 1988.  As a result, he maintains, his February 22, 1989 and February 27, 1989 statements were inadmissible as the "fruit" of this previous interrogation.  In his first ground for relief, petitioner asserts that the same investigator failed to honor the invocation of his right to remain silent during the February 27th interrogation.  Finally, in his second ground for relief, petitioner contends that the investigator also ignored the assertion of his right to counsel during the February 27th interrogation.  For these reasons, petitioner argues, the trial court should have suppressed his February 22nd and February 27th statements.

A.  <u>Applicable Law</u>

A statement made by a person in custody cannot be admitted into evidence over his objection unless the person was informed that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed, during questioning.  *Miranda v. Arizona*, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966).  For a suspect to validly waive his *Miranda* rights, the relinquishment must be voluntary, in that it is a product of a free and deliberate

- 5 -

choice, and the waiver must be made with an awareness of the rights being abandoned and the consequences of doing so. *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986). Only if the "totality of the circumstances" reveal both an uncoerced choice and the required level of understanding about this choice may a court properly conclude that the rights under *Miranda* have been waived. *Id.*

Furthermore, if a person being subjected to custodial interrogation indicates that he wishes to remain silent and terminate the interrogation, the police must scrupulously honor that person's right. *Miranda*, 384 U.S. at 473-74, 86 S.Ct. at 1627-28. When an accused has asserted his Fifth Amendment right to deal with the police only through counsel, no further statement taken from him is admissible until counsel has been made available to him, unless the suspect himself initiates further communication. *Edwards v. Arizona*, 451 U.S. 477, 484-85, 101 S.Ct. 1880, 1884-85, 68 L.Ed.2d 378 (1981).

The Sixth Amendment right to counsel attaches when formal judicial proceedings are initiated against an accused by way of indictment, information, arraignment, or preliminary hearing. *United States v. Gouveia*, 467 U.S. 180, 187-89, 104 S.Ct. 2292, 2297-98, 81 L.Ed.2d 146 (1984); *Kirby v. Illinois*, 406 U.S. 682, 688, 92 S.Ct. 1877, 1881, 32 L.Ed.2d 411 (1972). Once the right to counsel has attached and been asserted, no representative of the state may initiate contact with a

criminal defendant without his attorney's permission. *Michigan v. Jackson*, 475 U.S. 625, 636, 106 S.Ct. 1404, 1411, 89 L.Ed.2d 631 (1986); *Maine v. Moulton*, 474 U.S. 159, 170-71, 106 S.Ct. 477, 484, 88 L.Ed.2d 481 (1985). Absent a valid waiver, a criminal defendant has a right to the presence of an attorney during any interrogation that occurs after the right attaches. *Moran*, 475 U.S. at 428, 106 S.Ct. at 1144.

## B. Discussion

During suppression hearings held during trial, as well as at the trial itself,[2] the following relevant facts regarding petitioner's various statements were adduced.[3] After an extensive multi-state investigation which took several months, petitioner was arrested by the Richardson Police Department on December 20, 1988 in connection with the murder of Rozanne Gailiunas. (SF-LXVI 5). Gailiunas had been discovered in her home on October 4, 1983 with two gunshot wounds to the head. She died three days later. (SF-LXIII: 145-46, 148-51, 206). The case remained unsolved until 1988 when the Richardson Police Department was given information that a

_____

[2]   The facts surrounding petitioner's statements given in February of 1989 were elicited from the relevant parties at both the pre-trial hearing and during trial, with similar if not identical testimony given at both. The circumstances surrounding the petitioner's interrogation on December 20, 1988, however, were not testified to at the pre-trial suppression hearing. Instead, these facts were elicited through the cross-examination of Detective Morris McGowan during trial, after defense counsel were provided a copy of the transcript of this interrogation. (SF-LXXIX 52–62, 69-110, 117-46).

[3]   *See generally* the trial court's findings of fact and conclusions of law signed and entered March 10, 1994, contained in Supplemental Transcript at 1-10.

- 7 -

woman named Joy Aylor had hired someone to kill Gailiunas. After some investigation, the police determined that the money given as payment for the murder had passed through several people's hands. The last person in this chain was petitioner, and the police began searching for petitioner in the summer of 1988. But when petitioner was arrested in December of 1988, the police did not know whether he had committed the murder, or whether he had passed some or all of the money he received to another person who had then murdered Gailiunas. (SF-LXVI 16; LXX 6-14, 109, 116-18).

On December 20, 1988, while in police custody at the Richardson Police Department, petitioner was questioned by the lead detective in the case, Morris McGowan. This interrogation was audio taped. McGowan began the interrogation by reading petitioner his *Miranda* rights. During the interrogation, petitioner several times mentioned his belief that he needed to speak to an attorney before dealing with the police. Nonetheless, McGowan continued to talk to petitioner, assuring him that anything he said in the conversation would be off the record and inadmissible in court. Petitioner made no inculpatory statements to McGowan that day. Instead, the two spoke about petitioner's life on the run and his concern for his wife, his children, and his girlfriend, as well as McGowan's desire to have petitioner cooperate with the police. When specifically asked by McGowan during the interview if he had

shot "the girl," petitioner answered "no." (SF-LXXXX Defense Record Exhibits 5 and 6).

On December 21, 1988, petitioner was arraigned by a magistrate judge and advised of his *Miranda* rights. He was not appointed an attorney during the arraignment, nor did he request that one be appointed for him. (SF-LXVIII 26-31). On December 22, 1988, McGowan received a message that he should contact the jail because petitioner wanted to see him. (SF-LXVI 63). When McGowan spoke to petitioner, petitioner told McGowan that he was given money to kill Gailiunas but passed $1000 of the money, as well as the information about Gailiunas, to a drug dealer he knew named Chip, who had agreed to kill her. (SF-LXVI 57-58, 63-64). Petitioner also told McGowan where he had last seen Chip and gave a description of him. (SF-LXVI 65). McGowan assured petitioner that anything he said during this interview would not be used against him. (SF-LXVI 64).

On December 27, 1989, Jan Hemphill was appointed to represent petitioner. The two met several times during the next two months. (SF-LXXXX Defendant's hearing exhibit #2). In January, the lead prosecutor informed Hemphill that the state was interested in prosecuting and seeking the death penalty against the shooter and the person who initially hired the killer. The prosecutors were thus willing to work with the middle-men in the scheme. (SF-LXVI 149-50; LXVII 54). On February 21, 1989, petitioner told McGowan he had decided to cooperate with the

police. Petitioner informed McGowan that he had spoken with Hemphill and that Hemphill had given permission for petitioner to contact the police. (SF-LXVI 6). McGowan called one of the prosecutors, who in turn verified with petitioner's attorney that the police had permission to speak to petitioner and to verify his story with a polygraph examination. (SF-LXVI 135, 137-38; LXVII 59-61). On February 22, 1989, petitioner met with McGowan, who again informed petitioner of his *Miranda* rights. Petitioner then completed a six-page written statement in which he outlined how he received $1500 to kill Gailiunas and gave $1000 of the money to a man named Chip. McGowan informed petitioner that this statement would have to be verified by a polygraph examination, which was scheduled for February 27, 1989. (SF-LXVI 7-12).

Prior to the polygraph examination, petitioner was again given his *Miranda* rights by the polygraph technician, Richard Strauss. Petitioner then underwent a polygraph examination, which he failed.[4] After being told that he failed the examination, petitioner was questioned once again by McGowan. McGowan advised petitioner of his *Miranda* rights yet again and asked him tell his story once more. After petitioner recounted the "Chip" story again, McGowan stated he did not believe petitioner was telling the whole truth. McGowan then showed him a picture

---

[4]     Portions of the pre-examination interview with Strauss were admitted into evidence, but all statements and references to the fact that a polygraph examination was given were not. (SF-LXXXX St. Exh. 56B(1)).

- 10 -

of Chip and informed petitioner the police were in the process of finding Chip.

McGowan asked petitioner what would happen if Chip were questioned about the

murder and denied any involvement.  Petitioner stated that it would lead "back to

him" and asked McGowan if he could "go back and think about it."  McGowan

replied that he "wanted it now."  Petitioner then admitted killing  Gailiunas.

Petitioner subsequently gave both audiotaped and videotaped statements in which he

admitted killing the victim for $1500.  His written, audio taped, and videotaped

statements were admitted into evidence at trial.  (SF-LXVI 16-30).

### 1. December 20, 1988 Statement

Petitioner concedes that the text of his December 20th custodial interview was

not admitted at trial.  He contends, however, that because Officer McGowan ignored

his repeated requests to speak to an attorney during this interrogation, the statements

that he gave in February of 1989 are inadmissible "fruit" of this initial interrogation.

As support for this claim, petitioner cites *Wong Sun v. United States*, 371 U.S. 471, 83

S.Ct. 407, 9 L.Ed.2d 441 (1963).  In *Wong Sun*, a Fourth Amendment case, the

Supreme Court held that physical evidence found as a result of an illegal arrest, or a

custodial statement made subsequent to an illegal arrest, is inadmissible at trial as

being tainted by the illegal arrest, unless there is sufficient attenuation between the

arrest and the evidence sought to be admitted at trial.  *Id.*, 371 U.S. at 487, 83 S.Ct.

at 417. Petitioner argues that this "fruit of the poisonous tree" doctrine should be extended to render his February statements inadmissible.

Respondent counters that *Wong Sun* is inapplicable because no "fruit" was obtained as a result of the December 20th interview, and because petitioner's February statements were completely attenuated from either of the December interviews.[5] In support, respondent cites *Oregon v. Elstad*, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). In that case, an inculpatory statement was taken from Elstad without *Miranda* rights having been read to him. This statement was excluded from his trial, but a subsequent statement was admitted. The Supreme Court held that the second statement was not inadmissible as the illegal "fruit" of the first statement because the first statement was tainted by only a procedural *Miranda* violation and Elstad had been advised of and waived his Fifth Amendment rights prior to giving the second statement. *Id.*, 470 U.S. at 306, 318, 105 S.Ct. at 1291, 1298.

The present situation differs from *Elstad* in two ways. First, as petitioner notes, the Supreme Court has recently held that *Miranda* is a constitutionally-based

---

[5] Respondent does not argue that *Wong Sun* is inapplicable where there has been a Fifth Amendment, as well as a Fourth Amendment, violation. Thus, the court assumes, without deciding, that it does apply under such circumstances. See *United States v. Cherry*, 794 F.2d 201, 207-08 (5th Cir. 1986), *cert. denied*, 479 U.S. 1056, 107 S.Ct. 932 (1987) (appearing to assume that "fruits" doctrine would apply where government attempts to use derivative evidence obtained from exploitation of statements obtained in violation of *Miranda*).

decision.  See *Dickerson v. United States*, 530 U.S. 428, 431-32, 120 S.Ct. 2326, 2329-30, 147 L.Ed.2d 405 (2000).  Arguably, therefore, the distinction in *Elstad* between a procedural *Miranda* violation and a substantive violation is now no longer valid.

Second, and more telling, in the instant case there was neither a mere procedural violation nor a statement taken as a result of the violation.  In this case, McGowan did not fail to read petitioner his *Miranda* rights, but instead failed to honor petitioner's request for an attorney.  This was more than a mere "procedural" violation of petitioner's Fifth Amendment rights.  Indeed, in *Elstad* the Court specifically distinguished a failure to advise a suspect of his Fifth Amendment rights under *Miranda* from "police infringement of the Fifth Amendment itself."  *Elstad*, 470 U.S. at 309, 105 S.Ct. at 1293.  But, although in this case there was police infringement of the Fifth Amendment, petitioner gave no statement to the police as a result of this violation.  Indeed, the police did not hear anything about the "Chip" story from petitioner until two days later and did not receive a full confession from petitioner until two months later.

Neither the Supreme Court nor the Fifth Circuit has addressed a case similar to the one at hand.  The Ninth Circuit, however, recently did so in *Garvin v. Farmon*, 258 F.3d 951 (9th Cir. 2001), *cert. denied*, __ U.S. __, 122 S.Ct. 1546 (2002).  In that case, Garvin requested an attorney during a custodial interrogation.  The request was not honored and the interrogation continued, with the police officer assuring

Garvin that any statement she gave would not be used against her. She did not give a statement during that interrogation. Instead, Garvin initiated contact with the police three days later and confessed. *Garvin*, 258 F.3d at 953. The Ninth Circuit held that, while it was clear that Garvin's constitutional rights were violated during the first interview and that the violation was "egregious," the state court's application of *Elstad* was not unreasonable where the state court held that, given the "totality of the circumstances," the confession was admissible and was not influenced by the earlier violation. Specifically, the court noted the lapse of three days, Garvin's sophistication and knowledge of the criminal justice system, the fact that she had in the interim been to court and spoken to a friend, and the fact that she was again advised of her *Miranda* rights prior to confessing. *Id.* at 954, 957-58. See also *Brown v. Illinois*, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 2261, 45 L.Ed.2d 416 (1975) (in context of Fourth Amendment, in determining whether confession was sufficiently attenuated from taint of illegal arrest, court should look to temporal proximity of arrest and confession, presence of intervening circumstances, and purpose and flagrancy of official misconduct); *United States v. Basey*, 816 F.2d 980, 995 (5th Cir. 1987) (although fact that *Miranda* warnings given prior to confession does not alone prove sufficient attenuation, it may be given great weight in some situations).

In the case at hand, while the Fifth Amendment violation was flagrant, there was a two month interval between the violation and the February statements.

- 14 -

Moreover, petitioner was not only arraigned on December 21 but, most importantly, was appointed counsel several days later.  Further, petitioner both consulted with his attorney and initiated further contact with the police in an effort to cooperate with the police and improve his own situation.  He was also informed of his *Miranda* rights on February 22 and again on February 27.  In the light of all these intervening circumstances, it cannot be said that the statements obtained by the police in February were obtained by exploiting the interrogation of petitioner on December 20.  Instead, the admissibility of the February statements should be determined solely by the circumstances surrounding those statements.  See *Wong Sun*, 371 U.S. at 488, 83 S.Ct. at 417 (question is whether subsequent evidence has been obtained by exploitation of previous illegality or by means sufficiently distinguishable as to be purged of the taint of the previous illegality).

The state *habeas* court concluded that, even if *Wong Sun* does apply, any taint was completely attenuated before petitioner's February statements due to the intervening circumstances of the time lapse, the appointment of counsel and her discussions with petitioner, petitioner's initiation of contact with McGowan on February 21, and the *Miranda* warnings given to petitioner on February 22 and 27.  (St. Hab. Tr. 914-15).  This conclusion is not an unreasonable application of federal law.

- 15 -

## 2. February 27 Statement

In his first and second grounds for relief, petitioner further asserts that his right to silence and his right to counsel were violated during the interrogation on February 27th, because the interrogation was not terminated when he asked to "go back and think about it." Petitioner maintains that this statement should, therefore, have been suppressed by the trial court.

It is well established that law enforcement officers must immediately cease questioning a suspect who has clearly asserted his right to have counsel present during a custodial interrogation. *Davis v. United States*, 512 U.S. 452, 458-59, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994). The test is whether a reasonable police officer in those circumstances would understand a statement to be a request for an attorney. *Id.,* 512 U.S. at 459, 114 S.Ct. at 2355. An accused may waive his right to have counsel present during questioning if he has been made sufficiently aware of his right to have counsel present and of the possible consequences of foregoing the assistance of counsel. *Patterson v. Illinois*, 487 U.S. 285, 292-93, 108 S.Ct. 2389, 2395, 101 L.Ed.2d 261 (1988). Generally, an accused who is admonished with the warnings set forth in *Miranda* has been sufficiently apprised of his Sixth Amendment right to counsel. *Id.*, 487 U.S. at 296, 108 S.Ct. at 2397.

The record of the trial establishes that petitioner was appointed an attorney, met with the attorney, chose to speak to the police, was read his *Miranda* rights

- 16 -

before the polygraph examination, had signed a document stating that he understood that he had the right to have an attorney present, and had then been read his *Miranda* rights again before McGowan began speaking to him again.  (SF-LXXXX Defendant's Hearing Exh. 1).  The state *habeas* court concluded that petitioner had waived his right to counsel when, after consultation with his attorney, he initiated contact with McGowan on February 21 indicating a desire to cooperate with the police.  (St. Hab. Tr. 903).  The state *habeas* court further concluded that petitioner never reasserted this right, and thus his right to counsel was not violated when McGowan did not terminate the interview on February 27.  (St. Hab. Tr. 904).  This court agrees that petitioner, knowing that he had a right to have his attorney present during questioning, clearly waived that right.  Under these circumstances, a reasonable police officer would not have understood his statement "can I go back and think about it" to be a renewed invocation of his right to have an attorney present during questioning.  The state *habeas* court's conclusions, therefore, did not result in a decision that is contrary to established federal law.

Petitioner further claims that his statement "can I go back and think about it" was an unambiguous invocation of his right to remain silent.  He contends that there was "no doubt" that McGowan knew petitioner wished to return to the jail and not talk to the police any longer.  Moreover, petitioner contends that in assessing whether he invoked his right to remain silent, all of the surrounding circumstances

should be examined. Specifically, petitioner asserts that because he had been in jail for three months at the time of his confession, he understood that he had to be "subservient" and thus phrased his desire to remain silent as a question. (Hab. Pet. 30-31).

Petitioner raised this claim on direct appeal. The Court of Criminal Appeals applied *Davis v. United States* when analyzing this claim, as well as its own case law and case law from other jurisdictions. The court concluded that petitioner's request to "go back and think about it" was, at best, an ambiguous or equivocal assertion of his right to remain silent. Accordingly, the court held that McGowan was not required to cease the interrogation at that point. *Hopper v. State*, No. 71,477, op. at 23-25.

The Supreme Court has not yet determined whether *Davis* applies to circumstances where a suspect makes an ambiguous assertion of his right to remain silent. However, the Fifth Circuit, as well as several other circuits, have either directly found or assumed that *Davis* applies to such situations. See *Burket v. Angelone*, 208 F.3d 172, 200 (4th Cir. 2000) (state court's determination -- that defendant's statement "I just don't think that I should say anything" was not clear invocation of right to remain silent -- was not contrary to clearly established federal law), *cert. denied*, 530 U.S. 1283, 120 S.Ct. 2761 (2000); *Barnes v. Johnson*, 160 F.3d 218, 224-25 (5th Cir. 1998) (state *habeas* court's conclusion that Barnes did not

invoke right to remain silent where he made ambiguous assertion of right that was clarified by police officer was not unreasonable application of federal law), *cert. denied*, 526 U.S. 1118, 119 S.Ct. 1768 (1999); *United States v. Banks*, 78 F.3d 1190, 1197 (7th Cir.) (applying *Davis* in context of invocation of right to remain silent), *vacated on other grounds*, 519 U.S. 990, 117 S.Ct. 478 (1996); *United States v. Ramirez*, 79 F.3d 298, 305 (2nd Cir.) (assuming *Davis* applies, defendant did not clearly invoke right to remain silent where he answered some questions and refused to answer others), *cert. denied*, 519 U.S. 850, 117 S.Ct. 140 (1996); *United States v. Johnson*, 56 F.3d 947, 995 (8th Cir. 1995) (applying *Davis* where defendant makes conflicting statements, some saying he should not talk to the police and some saying he will). Most recently, the Fifth Circuit once again declined to address whether *Davis* applies to invocations of the right to remain silent, but also noted that it had previously held in *Barnes* that an application of *Davis* to the invocation of silence is not contrary to clearly established Supreme Court law under the AEDPA. See *Soffar v. Cockrell*, 300 F.3d 588, 594 n.5 (5th Cir. 2002).

Petitioner's assertion of the right to remain silent was ambiguous in the circumstances of this case. It was not unreasonable for the Court of Criminal Appeals, following Fifth Circuit precedent, to apply *Davis* in the context of an ambiguous assertion of the right to remain silent. In *Davis*, the Supreme Court held that the statement "maybe I should talk to a lawyer" was an ambiguous request for

an attorney, after which the police were neither required to cease questioning nor required to ask clarifying questions. *Davis*, 512 U.S. at 460-62, 114 S.Ct. at 2356-57. Contrary to petitioner's argument, the test is not whether a particular officer knew or should have known that a suspect was asserting his *Miranda* rights, but rather whether a reasonable officer, in light of the circumstances, would understand a statement to be a request for an attorney. *Id.*, 512 U.S. at 459, 114 S.Ct. at 2355. Thus, the state court's holding -- that "can I go back and think about it" was an ambiguous assertion of the right to remain silent that did not require McGowan to cease questioning petitioner -- is not an unreasonable application of federal law. Petitioner's first through third grounds for relief are without merit and are therefore overruled.

## V. INEFFECTIVE ASSISTANCE OF COUNSEL
### (Ground No. 4)

In his fourth ground for relief, petitioner contends that he was denied the right to effective assistance of counsel because his attorney: (1) did not accompany him to the polygraph examination and therefore was not present during the February 27 interrogation; and (2) failed to obtain an agreement from the police that petitioner would not be questioned beyond the polygraph examination.

### A. Applicable Law

The Sixth Amendment to the United States Constitution guarantees a defendant in a criminal case reasonably effective assistance of counsel. *Cuyler v.*

*Sullivan,* 446 U.S. 335, 344-45, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980). In order to obtain federal *habeas* relief due to ineffective assistance of counsel, a petitioner must satisfy the two-prong test established in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Petitioner first must demonstrate that counsel's performance fell below an objective standard of reasonableness. *Id.,* 466 U.S. at 687-88, 104 S.Ct. at 2064. He then must show how this deficiency prejudiced the defense. *Id.,* 466 U.S. at 691-92, 104 S.Ct. at 2067. Prejudice results when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.,* 466 U.S. at 694, 104 S.Ct. at 2068. See also *Lockhart v. Fretwell,* 506 U.S. 364, 372, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993) (*habeas* petitioner must show that trial result was unreliable or proceeding fundamentally unfair due to deficient performance of counsel).

## B.  Discussion

Petitioner first asserts that his attorney, Jan Hemphill, erred by not accompanying him to the polygraph examination. As a result, she was not present during the February 27 interrogation. Petitioner alleges that, had Hemphill been present at the polygraph examination, she would have advised him not to speak to the police after he failed the polygraph exam and thus would have prevented his confession to capital murder. Respondent contends that Hemphill's representation was not substandard. Moreover, she maintains that there is not a reasonable

probability that the outcome of the case would have been different, as petitioner might still have confessed to the police and the state had evidence that petitioner had confessed to other people.

Jan Hemphill testified at length regarding her representation of petitioner at a suppression hearing held during petitioner's trial.  She testified that she represented petitioner from December 27, 1988 until April of 1991, when she was appointed to a state district court bench.  (SF-LXVII 35-38).  Hemphill had very little recollection of events and was relying primarily on notes she had made at the time she represented petitioner.  At this same hearing, some of Hemphill's notes and financial records, which were admitted into evidence, indicated that she met with petitioner on December 29, 1988, when she was appointed, as well as on January 10, January 12, January 17, and February 21, 1989.  These notes also reflected a conversation Hemphill had with the lead prosecutor, Kevin Chapman, in January of 1989 in which Chapman told her that if petitioner talked to the Richardson Police Department, told the truth, and did not kill the victim himself, he could be helpful to the state as a witness.  (SF-LXXXX Defendant's Hearing Exh. 2).  Hemphill candidly testified that she believed she had made a mistake in not accompanying petitioner to the polygraph examination on February 27, 1989.  (SF-LXVII 119, 125-26).  She further stated, however, that she believed that petitioner would pass the polygraph

examination, that she knew that there were risks in taking the polygraph, but that she believed the benefits outweighed the risks. (SF-LXVII 92, 102-03).

During the state writ proceedings, the state sought and obtained permission to examine and submit as evidence, in response to the ineffective assistance of counsel claim, all of Hemphill's unredacted notes and letters regarding this case.[6] These notes reflect that petitioner told Hemphill that he hired a man named "Chip" to kill Gailiunas and paid him $1000. (St. Hab. Tr. 591). These notes also reveal that, during Hemphill's meeting with petitioner on February 21, petitioner decided to cooperate with the police. Hemphill advised him that, even if he were not tried for capital murder, he could be tried for conspiracy to commit capital murder and, if tried, there was a good chance that he could receive a life sentence. (St. Hab. Tr. at 595). Hemphill also wrote to petitioner on February 10. The letter informed petitioner that another attorney to whom petitioner was interested in speaking planned to visit him. Hemphill further told petitioner:

> I wrote Mr. Jagmin a summary of the fact situation we are
> dealing with and the decision that needs to be made as
> soon as possible. Please feel free to talk with him and be
> as honest with him as you have with me. As you know,
> *whatever advice any attorney gives you is based largely on what*
> *you tell the attorney.*

---

[6] Because these notes and letters addressed conversations between petitioner and Hemphill within their attorney/client relationship, they were not admitted into evidence at any hearings that occurred during the trial.

- 23 -

(St. Hab. Tr. at 600) (emphasis added).

Petitioner asserts that, prior to his confession, his attorney had spent minimal time with him and minimal time learning about the case. Thus, petitioner insists, Hemphill's decision to allow him to deal with the police officers on his own was an unreasonable one. Moreover, even if it was reasonably effective assistance of counsel to allow petitioner to speak to the police alone, petitioner argues, Hemphill was deficient in not obtaining a specific agreement from the state not to question petitioner "outside of the boundaries" of the polygraph examination. (Hab. Pet. 53-55).

The question presented by this ground for relief is whether petitioner's attorney was ineffective for believing her client when he told her that he did not kill the victim and instead gave the money to someone else. Clearly, Hemphill recommended to petitioner that he cooperate with the police and gave permission to the police to question him because she had been told by the lead prosecutor that the middle-men in the murder-for-hire scheme could be helpful witnesses for the state and that the state intended to seek the death penalty only against Joy Aylor and the shooter. Had petitioner been telling the truth when he told both his attorney and the Richardson police the "Chip" story, he presumably would have passed the polygraph examination and been questioned no further by the police. Thus, Hemphill's absence from the polygraph examination and failure to secure an

- 24 -

agreement that the police not question petitioner beyond the questions posed during the polygraph examination would have had no adverse consequences. Had petitioner been telling the truth when he said that he did not kill the victim, there is no reason to believe that he would have been prosecuted for capital murder.

Petitioner does not contend that, had he told Hemphill the truth, she would have permitted him to give any statement to the police. Indeed, it was made clear to Hemphill by the lead prosecutor that the state would seek the death penalty against the shooter. Therefore, the question is whether an attorney renders ineffective assistance in a capital murder case when she believes her client and tailors her representation accordingly.

In *Strickland*, the Supreme Court stated that:

> [t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant.

*Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066. The Court also noted in *Strickland* that a fair assessment of an attorney's performance requires one "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*, 466 U.S. at 689, 104 S.Ct. at 2065. Likewise, the Fifth Circuit has recognized that, in general, an attorney cannot be deemed ineffective for failing to discover evidence which a defendant knows about, but

- 25 -

withholds from counsel. *Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir. 1997); see also *Bryant v. Scott*, 28 F.3d 1411, 1415 (5th Cir. 1994) (recognizing reasonableness of attorney's investigation may "critically depend" on information provided by defendant and on defendant's own "strategic decisions" about the representation).

Petitioner nevertheless asserts that his attorney was ineffective because, as a matter of law, criminal defense lawyers must assume that their clients are lying to them. (Hab. Pet. at 57). Not surprisingly, no authority is cited in support of this troublesome proposition. Undoubtedly, had Hemphill assumed petitioner was lying to her, she would have made different choices. Indeed, as Hemphill herself acknowledged, her representation of petitioner cannot be considered, in hindsight, to be the best possible representation she might have given. (SF-LXVII 119). In the absence of perfect knowledge, however, Hemphill's representation was based primarily on what petitioner told her about his involvement in the crime. Any review of the effectiveness of counsel's representation must be viewed from her perspective at the time of the representation, with the facts as they were known to her. Hemphill advised petitioner of the consequences of speaking with the police and specifically informed him that an attorney's advice to a client is based on what the client tells her. Here, petitioner here made an informed choice with full knowledge that his attorney's advice was based on false information provided by him. Under these circumstances, counsel cannot be considered constitutionally ineffective for failing to

- 26 -

act differently.  See *Fuller v. Johnson*, 158 F.3d 903, 907 (5th Cir. 1998) (defense attorney not ineffective for failing to advise client *not* to testify before grand jury where attorney and client discussed the pros and cons of testifying, the available evidence indicated client's culpability was limited, client was convinced of his ability to convince grand jury that he was not involved, and client ultimately made decision to testify), *cert. denied*, 526 U.S. 1133, 119 S.Ct. 1809 (1999).

When addressing this issue on direct appeal, the Texas Court of Criminal Appeals held that Hemphill rendered reasonably effective assistance of counsel because she reasonably believed, based on petitioner's lie, that he would not be exposed to the death penalty and would receive leniency for his cooperation.  *Hopper v. State*, No. 71,477, op. at 16.  That court further noted that a contrary holding would be based on "the distorting effects of hindsight" that *Strickland* forbids.  *Id.* at 18.  Because petitioner chose to lie to defense counsel, even having been told that an attorney's advice depends on the information provided by the client, the state court's conclusion is not an unreasonable application of the *Strickland* standard.  Therefore, this ground for relief is overruled.[7]

---

[7]     Having found that the performance of petitioner's attorney was not constitutionally deficient, this court need not address the prejudice prong of the *Strickland* analysis.  See *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069 ("there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one.").

## VI. THE BOOK DEAL
### (Ground Nos. 5-7)

In his fifth through seventh grounds for relief, petitioner asserts that his constitutional rights were violated because defense counsel was not informed that the lead detective and primary witness for the state, Morris McGowan, had signed an agreement prior to trial to receive monetary compensation for his assistance in writing a true crime book about the Gailiunas murder. Specifically, petitioner contends that the failure to disclose this information to defense counsel: (1) violated his due process rights under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); (2) violated his rights under the confrontation clause of the Sixth Amendment; and (3) constituted a structural error not subject to a harmless error review.

### A. Applicable Law

The suppression of evidence favorable to the accused where the evidence is material to either guilt or punishment violates the accused's due process rights. *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196-97. Under *Brady*, the prosecution has the duty to turn over to the defense both exculpatory and impeachment evidence. *United States v. Bagley*, 473 U.S. 667, 682, 683-84, 105 S.Ct. 3375, 3384-85, 87 L.Ed.2d 481 (1985). Evidence is material if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *Id.*,

- 28 -

473 U.S. at 682, 105 S.Ct. at 3383. A reasonable probability of a different result is shown when the suppression of evidence undermines confidence in the verdict. *Id.*

The confrontation clause of the Sixth Amendment guarantees a defendant the right to physically face those who testify against him and the right to conduct cross-examination. *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987). The confrontation clause also guarantees the *opportunity* for effective cross-examination. *Delaware v. Fensterer*, 474 U.S. 15, 19-20, 106 S.Ct. 292, 294, 88 L.Ed.2d 15 (1985) (per curiam).

## B. Discussion

Prior to the beginning of testimony at the trial of petitioner's co-defendant, Joy Aylor, the prosecutors became aware that the lead detective in both cases, Morris McGowan, had entered into a deal to assist in writing a true crime novel about the facts surrounding the case. Judge Pat McDowell, the trial judge in the Aylor case, who was also the trial judge in petitioner's case, conducted a hearing on this issue prior to the Aylor trial. McGowan was questioned about the book deal by both the prosecution and the defense. During the state *habeas* process in this case, Judge McDowell took judicial notice of the relevant portions of the record from the Aylor trial and included those portions of the record in the state *habeas* transcript. (St. Hab. Tr. 669-791, 926). Through these excerpts from the Aylor trial, along with the

actual contract concerning the book, the following relevant facts have been gleaned from the state *habeas* record.

The book deal began when McGowan spoke to an attorney friend in June of 1988, after Joy Aylor had been arrested but before petitioner had been identified as a suspect. The friend mentioned that the case would make an interesting book. A week later, McGowan contacted the friend about the possibility of someone writing a book about the case. (St. Hab. Tr. 669-670, 693, 695-96). This friend subsequently contacted the writer, Carlton Stowers. McGowan met with Stowers in July of 1988. No decision about writing a book was made at that time. (St. Hab. Tr. 672, 702, 704). In January of 1989, McGowan met with another true crime author, who offered him $75,000 to help with the writing of a book. McGowan ultimately declined this offer. (St. Hab. Tr. 706, 708-10). Stowers and McGowan continued to speak periodically. (St. Hab. Tr. 674). In late 1989 or early 1990, McGowan and Stowers entered into an agreement to collaborate on a book. (St. Hab. Tr. 711).

In August of 1990, Stowers sent McGowan a book proposal, along with a letter agreement setting out the terms and conditions of a financial agreement. (St. Hab. Tr. 714). McGowan did not read this information initially and told Stowers that he did not want to read any of the financial information at that point. (St. Hab. Tr. 714-15). In June of 1991, McGowan met with an attorney, Don Crowder, and gave Crowder power of attorney to negotiate, on his behalf, a contract with Stowers.

- 30 -

(St. Hab. Tr. 690, 725).  The contract was signed with Stowers in July 1991.  (St. Hab. Tr. 690, 185).  The gist of this contract, unknown to McGowan at that time, was that McGowan would receive a $12,500 advance against royalties when the book was halfway finished, another $12,500 advance when the book was completed, fifty percent of any future profit from the book, and fifty percent of any profit from any future movie or mini-series based on the book.  (St. Hab. Tr. 606, 728-31).  McGowan acknowledged at Aylor's trial, however, that although he did not know the specifics of the contract, he anticipated that he would receive fifty percent of any profit from the book.  (St. Hab. Tr. 728).  In a meeting with both his attorney and Stowers prior to petitioner's trial, McGowan agreed to speak with Stowers about the book after petitioner's trial.  McGowan agreed to do so because, at that point, Joy Aylor was still at large and he did not believe she would be returning.  (St. Hab. Tr. 732-33).  During the trial, McGowan had dinner with Stowers and a woman from a film production company, who attended the trial along with Stowers.  They did not discuss McGowan's investigation of the case.  (St. Hab. Tr. 734-35).

After petitioner's trial ended in March of 1992, McGowan met with Stowers about the case and discussed the investigation in detail.  (St. Hab. Tr. 736-38).  In July of 1992, McGowan received a check for $55,000.  (St. Hab. Tr. 739-41).  By the time of Joy Aylor's trial in 1994, McGowan had received approximately $109,500, including a fee and royalties from a fictionalized mini-series based on the book.  (St.

- 31 -

Hab. Tr. 742-46). McGowan never told the prosecutors about this agreement until he was specifically asked about it in 1994, before Joy Aylor's trial began, because he knew that the prosecutors would not approve of the agreement. (St. Hab. Tr. 622, 747). At Aylor's trial, McGowan testified that his financial interest in the book never affected his investigation of the case. (St. Hab. Tr. 751).

### 1. *Brady* Claim

Respondent concedes that the evidence of the book deal was evidence that could have been used to impeach McGowan's testimony at petitioner's trial and that this evidence was withheld from the defense. The only question, therefore, is whether this evidence constitutes *material* impeachment evidence.

The evidence shows that McGowan became interested in collaborating with a writer about the case of the death of Rozanne Gailiunas in 1988. Although he spoke to a couple of authors about the possibility, he did not enter into an oral agreement to do so until after the end of 1989 or the beginning of 1990 -- several months after petitioner confessed to him. The written agreement was signed prior to petitioner's trial, in which McGowan was a key prosecution witness. Petitioner contends that evidence of the book deal is material because it may have affected McGowan's investigation and trial testimony by providing him with a financial incentive to see that petitioner was arrested, tried, and convicted.

McGowan's behavior in entering into the book deal and failing to disclose it to the prosecutors is certainly not laudable. Nothing in the record, however, indicates that McGowan had any financial incentive that would influence the methods he used and choices he made in investigating the case or in obtaining petitioner's conviction. McGowan did not enter into an agreement until several months after petitioner confessed to the murder. He did not sign a written contract until several months later. There is, therefore, no evidence that this book deal was a financial incentive for McGowan during the five years that he investigated the case, up to and including the point where petitioner confessed. Indeed, two different authors expressed an interest in writing a book about the case before petitioner was identified as a suspect, indicating that the success of a book about the story would not hinge on petitioner's participation in the crime.

Moreover, none of the money McGowan anticipated receiving was tied to petitioner's conviction. Rather, it was based on when the book was completed and on sales of the book and future movies. Petitioner argues that McGowan had a financial interest in insuring that he was convicted because this would increase the likelihood of the book's success on the market. In addressing this claim, the state *habeas* court observed that Stowers' book focused on Joy Aylor. Indeed, the details of petitioner's trial are not recited until the epilogue and cover only four and a half pages of the 357 pages in the book. (St. Hab. Tr. 928, #121). Petitioner has not

argued, much less presented clear and convincing evidence, that these factual findings are incorrect. The record therefore indicates that petitioner's guilt was insignificant to the success of Stowers' book.

Further, in determining the materiality of the evidence withheld, a court should look to whether the testimony was strongly corroborated by other evidence. *Kopycinski v. Scott*, 64 F.3d 223, 226 (5th Cir. 1995). A defendant must show that the evidence withheld could reasonably be taken to put the case in a different light so as to undermine confidence in the verdict. *Gibbs v. Johnson*, 154 F.3d 253, 256 (5th Cir. 1998), *cert. denied*, 526 U.S. 1089, 119 S.Ct. 1501 (1999).

Much of McGowan's testimony was corroborated by other evidence. Brent Tourangeau testified that he was present when petitioner made his initial full confession on February 27, 1989. He heard petitioner ask to "go back and think about it." (SF-LXXI 101-10). As noted earlier, the subsequent audio taped and videotaped confessions petitioner gave on February 27 were admitted into evidence, along with the written statement petitioner gave on February 22, 1989. (SF-LXXXX St. Exh. 55, 56 & 56(A)). Portions of the pre-polygraph examination, in which he repeated the "Chip" story, were admitted into evidence. (SF-LXXXX St. Exh. 56B(1)). In his confessions, petitioner admitted that he used a friend's gun and explained how he obtained it. The testimony of that friend, Terry Harmon, along with a police officer who responded to the scene of the murder and a firearm

specialist, established that Harmon's gun was used to kill the victim. (SF-LXIV 62-65; LXXI 72-80, 151). In his confession, petitioner explained that he gained entrance into the house by posing as a flower delivery man and that he left a plant in the house on the floor. This was corroborated by photographs from the house showing a plant sitting on the floor of the living room. (LXXXIX St. Exh. 11, 21). Finally, two of petitioner's friends testified that petitioner confessed to them that he had murdered the victim. Petitioner's letter confession to one of the friends was admitted into evidence. (SF-LXVIII 68-79; LXXXVII 10-77; LXXXX St. Exh. 63A).

In light of this corroborating evidence, the suppression of information regarding McGowan's book deal cannot reasonably be seen to have put petitioner's case in a different light so as to undermine confidence in the guilty verdict. In denying this ground for relief, the state *habeas* court initially concluded that petitioner had not established McGowan's potential bias. (St. Hab. Tr. 929-30, #127-28). Alternatively, the state *habeas* court concluded that evidence of McGowan's potential bias was not material due to the corroborating evidence of petitioner's confessions and guilt. (St. Hab. Tr. 933-35). These conclusions are not unreasonable.

## 2. Confrontation Clause Claim

Petitioner also contends that he was denied his constitutional rights under the confrontation clause because his attorneys were not able to cross-examine McGowan

- 35 -

about the book deal. As support, petitioner cites *Davis v. Alaska*, 415 U.S. 308, 94

S.Ct. 1105, 39 L.Ed.2d 347 (1974). In *Davis*, the Supreme Court ruled that Alaska's

state policy of not disclosing juvenile court records violated Davis' right to cross-

examine a prosecution witness at his burglary trial for his possible bias when the

witness himself was on juvenile probation for two separate burglaries. The Court

concluded that Davis was entitled to the reversal of his burglary conviction because

there had been "constitutional error of the first magnitude and no amount of showing

of want of prejudice would cure it." *Id.*, 415 U.S. at 318, 94 S.Ct. at 1111, citing

*Smith v. Illinois*, 390 U.S. 129, 131, 88 S.Ct. 748, 750, 19 L.Ed.2d 956 (1968).

However, the Supreme Court has subsequently held that a confrontation clause

violation is subject to a harmless error analysis. *Delaware v. Van Arsdall*, 475 U.S.

673, 679, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986).

Other than citing to *Davis v. Alaska*, petitioner does not explain why the book

deal cannot be addressed fully under the standard outlined in *Brady* and its progeny.

Contrary to petitioner's reliance on *Davis v. Alaska*, the Supreme Court in *Bagley*

specifically differentiated between the failure of the government to disclose

impeachment evidence and the direct restriction on cross-examination that occurred

in *Davis*. *Bagley*, 473 U.S. at 677-78, 105 S.Ct. at 3381. The Court then went on to

hold that suppression of impeachment evidence amounts to a constitutional violation

only if it deprives a criminal defendant of a fair trial. This occurs only if the evidence

is material to the case. *Id.,* 473 U.S. at 681-82, 105 S.Ct. at 3383. Clearly, the
Supreme Court has specifically rejected the extension of its confrontation clause case
law to circumstances where a defendant asserts that impeachment evidence has been
withheld by the prosecution.

The state *habeas* court concluded that petitioner's confrontation clause claim
was without merit because he failed to establish that the book deal showed any bias
by McGowan and because any denial of the right of confrontation was harmless. (St.
Hab. Tr. 936). These conclusions did not result in a decision that is contrary to
clearly established federal law.

### 3. Structural Error Claim

Finally, petitioner asserts that McGowan's behavior in accepting financial
remuneration for his assistance in writing a book about the case violated his due
process and equal protection rights under the Fourteenth Amendment and
constituted "structural error" requiring the reversal of his conviction and the granting
of a new trial. He asserts that, unlike a constitutional error that occurs during the
presentation of the case to the jury, the book deal was an error which cannot be
properly analyzed under a harmless error standard and instead requires an automatic
reversal of the conviction.

As support for this claim, petitioner relies on various cases where attorneys
were paid by third parties, where attorneys had media deals, and where government

witnesses had received some sort of payment for testifying. Petitioner's assertion, however, is not supported by the cases he cites. As petitioner acknowledges, none of these cases holds, or even suggests, that his allegations amount to "structural error" that is immune to a harm analysis. To the contrary, the Fifth Circuit has specifically held that a claim that counsel had a "media deal" with the client in order to be paid for his work must be addressed using the *Strickland* standard, under which prejudice must be shown. *Beets v. Scott*, 65 F.3d 1258, 1272-73 (5th Cir. 1995), *cert. denied*, 517 U.S. 1157, 116 S.Ct. 1547 (1996). The Fifth Circuit has also concluded that reversal of a conviction where contingent fees are paid to a government witness is warranted only where an informant is paid to target a particular defendant *before* the crime is committed. *United States v. Yater*, 756 F.2d 1058, 1067 (5th Cir.), *cert. denied*, 474 U.S. 901, 106 S.Ct. 225 (1985).

In short, none of the cases cited by petitioner supports his claim that, as a matter of public policy, his conviction should be reversed because a police investigator in the case signed a book deal before his trial began. Moreover, the Supreme Court has acknowledged only a limited set of circumstances involving structural error. These include where there has been a total deprivation of counsel or where the trial judge was not impartial. *Arizona v. Fulminante*, 499 U.S. 279, 309, 111 S.Ct. 1246, 1265, 113 L.Ed.2d 302 (1991). Thus, there is no support in

Supreme Court precedent for petitioner's contention that the structural error

doctrine should be extended to his case.

Nor is petitioner entitled to relief under a harmless error standard.  Under this

standard, a petitioner must prove that an error had a "substantial and injurious effect

or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619,

637, 113 S.Ct. 1710, 1722, 123 L.Ed.2d 353 (1993).  McGowan's book deal must,

therefore, be analyzed in the context of its effect on petitioner's trial -- not, as

petitioner urges, as a bad act committed by a public official.  Its effect on the trial

was defense counsel's inability to question McGowan about his potential bias

because of the book deal.  The *Brady/Bagley* materiality standard, however, is even

stricter than the *Brecht* standard.  *Kyles v. Whitley*, 514 U.S. 419, 435-36, 115 S.Ct.

1555, 1566-67, 131 L.Ed.2d 490 (1995).  Because this court has already determined

that the book deal evidence was not, under *Brady*, material evidence requiring a

reversal of this conviction, there is no need to re-evaluate the harm under the *Brecht*

standard.

Petitioner raised this issue in his state *habeas* application.  The state court

concluded that petitioner was not entitled to relief since none of the case law cited

supported petitioner's contention that his conviction should be overturned due to

McGowan's book deal.  (St. Hab. Tr. 944, 950).  This conclusion did not result in a

decision contrary to clearly established federal law. Petitioner's fifth through seventh grounds for relief are overruled.

## VII. REQUEST FOR EVIDENTIARY HEARING

Petitioner also requests that this court grant him an evidentiary hearing on all of the above issues. Petitioner asserts that he is entitled to an evidentiary hearing in federal court because he did not receive one during the state *habeas* proceedings and because he did not fail to develop his claims in the state court. *See* 28 U.S.C. § 2254(e)(2).

Although the court acknowledges that petitioner did not fail to develop his factual claims in the state court, he is not necessarily entitled to a hearing in federal court. Rather, to be entitled to such a hearing, a *habeas* petitioner must show either: (1) a factual dispute which, if resolved in his favor, would entitle him to relief; or (2) a factual dispute that would require development in order to assess the claim. *Murphy v. Johnson*, 205 F.3d 809, 815-16 (5th Cir.), *cert. denied,* 531 U.S. 957, 121 S.Ct. 380 (2000); *Robison v. Johnson,* 151 F.3d 256, 268 (5th Cir. 1998), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578 (1999). Petitioner has not alleged any factual dispute with regard to the claims he raises. To the contrary, he specifically relies on the facts presented at suppression hearings conducted during the trial. Although there was no hearing conducted at the petitioner's trial on his claims related to the book deal, the state *habeas* judge did conduct a lengthy hearing on the issue at the

trial of Joy Aylor, the record of which has been included in the state record for the instant case.  Petitioner does not dispute any of the evidence developed in that hearing or any of the factual findings made by the state *habeas* court.  Rather, he claims the state courts erred on direct and collateral review in their application of federal law to the facts presented to them.  This is insufficient to entitle petitioner to a hearing.

VIII.  <u>CONCLUSION</u>

Petitioner's application for writ of habeas corpus is **DENIED**.

**SO ORDERED**.

October __31__, 2002.

A. JOE FISH
CHIEF JUDGE